**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DANIEL DURGIN SR., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DISA GLOBAL SOLUTIONS, INC.,<br><br>Defendant. | Case No. 4:25-cv-00988<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiff Daniel Durgin Sr. ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendant DISA Global Solutions, Inc. ("DISA" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

**INTRODUCTION**

1. Plaintiff brings this class action against DISA for its failure to secure and safeguard approximately 3,332,750 persons' (including Plaintiff's) personally identifying information ("PII"), including names, Social Security numbers, driver's license numbers, other government ID numbers, financial account information, and other data elements.

2. DISA is a third-party administrator of employment drug tests, background screening, and transportation compliance services.

3. Between approximately February 9, 2024, and April 22, 2024, an unauthorized third party gained access to DISA's network systems and accessed and acquired files containing

the PII of individuals who utilized DISA's services, including Plaintiff and Class members (the "Data Breach").

4. DISA owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. DISA breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect PII in its possession from unauthorized access and disclosure.

5. As a result of DISA's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII was exposed as a result of the Data Breach, which occurred between approximately February 9, 2024, and April 22, 2024.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, and violations of the Fair Credit Reporting Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Daniel Durgin Sr.***

7. Plaintiff is a citizen of Massachusetts.

8. Plaintiff's employer utilized DISA in connection with completing certain employment screening services. As a condition of providing employment screening services to Plaintiff, DISA required Plaintiff to provide it with his PII.

9. Based on representations made by DISA, Plaintiff believed DISA had implemented and maintained reasonable security and practices to protect his PII. With this belief in mind, Plaintiff provided his PII to DISA in connection with obtaining employment screening services provided by DISA.

10. At all relevant times, DISA stored and maintained Plaintiff's PII on its network systems, including the systems affected in the Data Breach.

11. Plaintiff received a letter from DISA notifying him that his PII was affected in the Data Breach.

12. Had Plaintiff known that DISA does not adequately protect the PII they collect and maintain, he would not have agreed to provide DISA with his PII or agreed for his employer to obtain employment screening services from DISA.

13. As a direct result of the Data Breach, Plaintiff has suffered other injury and damages including, *inter alia*, a substantially increased and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; and deprivation of the value of his PII.

***Defendant DISA Global Solutions, Inc.***

14. Defendant DISA Global Solutions, Inc. is a Delaware corporation with its principal place of business located at 11740 Katy Freeway, Suite 900, Houston, TX 77079. It may be served through its registered agent: C T Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is

a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

16. This Court has general personal jurisdiction over Defendant DISA Global Solutions, Inc. because it maintains its principal place of business in this State, transacts business in this State, and contracts for goods or services in this State.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant DISA Global Solutions, Inc.'s principal places of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of DISA*

18. DISA "helps employers make informed staffing decisions with our comprehensive scope of services, including drug and alcohol testing, background check, occupational health, transportation compliance, and financial due diligence."[1] DISA describes itself as "the industry-leading provider of employee screening and compliance services."[2] DISA provides services to "more than 55,000 customers and 30% of Fortune 500 companies."[3]

19. In the regular course of its business, DISA collects and maintains the PII of individuals who utilize (or whose employers or potential employers utilize) its employment screening services, including Plaintiff and Class members. DISA required Plaintiff and Class members to provide it with their PII as a condition of providing employment screening services.

---

[1] *The DISA Difference*, DISA, https://disa.com/disa-difference (last accessed Mar. 4, 2025).
[2] Morgan Reynolds & Eden Hutchinson, *Employee Background Checks FAQ – What Employers Need to Know*, DISA (Nov. 12, 2024), https://disa.com/news/employee-background-checks-faq-what-employers-need-to-know.
[3] *Staffing & Recruiting*, DISA, https://disa.com/staffing-recruiting (last accessed Mar. 4, 2025).

20. DISA operates multiple online web platforms (such as DISAScreen) on which employment screening candidates and other users of DISA's services, including Plaintiff and Class members, can enter their PII in connection with using DISA's services.[4]

21. DISA's website contains a Privacy Policy that describes "how DISA uses and safeguards the personal information" provided to DISA through its websites and in connection with DISA's services.[5]

22. In the Privacy Policy, DISA states it "respects the privacy of the individuals and clients who are the subjects of DISA Services, including but not limited to background checks."[6] DISA also promises it "will collect, store, and use confidential information following best practices and also in compliance with applicable law, including the FCRA."[7]

23. DISA represents that it seeks "to use reasonable organizational, technical, and administrative measures to protect Personal Information under our control."[8]

24. Plaintiff and Class members are persons who used (or whose employers or potential employers used) DISA's employment screening services and who entrusted DISA with their PII in exchange for employment screening services.

***The Data Breach***

25. Between approximately February 9, 2024, and April 22, 2024—nearly two and a half months—an unauthorized third party gained access to DISA's network systems and accessed

---

[4] *See, e.g.*, *DISAScreen Smart Forms & Smart Automation*, DISA, https://ghrr.com/technology/smb-solutions/smart-forms-smart-automation (last accessed Mar. 4, 2025).
[5] *See Privacy Policy*, DISA (June, 2023), https://disa.com/privacy-policy.
[6] *Id.*
[7] *Id.*
[8] *Id.*

and acquired files containing the PII of Plaintiff and Class members.[9] The PII accessed and acquired in the Data Breach includes at least names, Social Security numbers, driver's license numbers, other government ID numbers, financial account information, and "other data elements."[10]

26. While DISA discovered the Data Breach on or about April 22, 2024, it waited until approximately February 24, 2025—over a full year after the Data Breach began and 10 months after discovering the Data Breach—to begin notifying Plaintiff and Class members that their PII had been compromised and stolen by cybercriminals.

27. DISA recognizes the risk of serious harm Plaintiff and Class members now face as a result of the Data Breach. DISA explicitly recommends affected individuals take action to protect themselves from harm as a result of the Data Breach, including enrolling in credit monitoring, reviewing credit reports, placing fraud alerts, and freezing their credit.[11]

28. Defendant's failure to promptly notify Plaintiff and Class members that their PII was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

---

[9] *Notice of Data Incident*, DISA, https://disa.com/notice (last accessed Mar. 4, 2025).
[10] *Id.*
[11] *See Sample Notification Letter*, available at: *DISA Global Solutions, Inc.*, OFF. OF THE ME. ATT'Y GEN. (Feb. 24, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/b823b27d-5fe2-4f09-8753-b362741d7f95.html.

***Defendant Knew that Criminals Target PII***

29. At all relevant times, Defendant knew, or should have known, that the PII that it collected and maintained was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from cyberattacks that it should have anticipated and guarded against.

30. It is well known among companies that store sensitive personally identifying information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[12]

31. PII is a valuable property right.[13] The value of PII as a commodity is measurable.[14] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15] American companies are estimated to have spent over $19 billion on acquiring

---

[12] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[13] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[14] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[15] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

personal data of consumers in 2018.[16] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

32. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

33. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[17]

34. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[16] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[17] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

***Theft of PII Has Grave and Lasting Consequences for Victims***

35. Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[18] [19]

36. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[20]

37. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[21]

38. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately

---

[18] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Feb. 12, 2025).

[19] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[20] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[21] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Feb. 12, 2025).

three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[22]

39. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

40. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, theft, and publication of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

## CLASS ALLEGATIONS

41. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

42. Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

---

[22] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

> All persons whose personally identifiable information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

43. Excluded from the Class are DISA Global Solutions, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

44. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

45. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. DISA reported to the Maine Attorney General's Office that 3,332,750 individuals were affected in the Data Breach.[23]

46. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII;

d. Whether Defendant breached its duties to protect Plaintiff's and Class members' PII; and

e. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

---

[23] *DISA Global Solutions, Inc.*, *supra* note 11.

47. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

48. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

49. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

50. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

51. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

52. DISA owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII in its possession, custody, or control.

53. DISA knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII and the importance of maintaining secure systems. DISA knew or should have known of the many data breaches that targeted companies that collect and store PII in recent years.

54. Given the nature of DISA's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, DISA should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

55. DISA breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class members' PII.

56. It was reasonably foreseeable to DISA that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

57. But for DISA's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

58. As a result of DISA's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in DISA's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## COUNT II
## NEGLIGENCE PER SE

59. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

60. DISA's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted by the FTC, the unfair act or practice by business, such as DISA, of failing to employ reasonable measures to protect and secure PII.

61. DISA violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and other Class members' PII, by failing to provide timely notice, and by not complying with applicable industry standards. DISA's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

62. DISA's violation of Section 5 of the FTCA constitutes negligence per se.

63. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA were intended to protect.

64. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Brach.

65. It was reasonably foreseeable to DISA that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

66. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of DISA's violations of Section 5 of the FTCA. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in DISA's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**

67. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

68. In connection with receiving employment screening services, Plaintiff and all other Class members entered into implied contracts with DISA.

69. Pursuant to these implied contracts, Plaintiff and Class members provided DISA with their PII. In exchange, DISA agreed to, among other things, and Plaintiff understood that DISA would: (1) provide a background check on Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII; and (3) protect Plaintiff's and Class members' PII in compliance with federal and state laws and regulations and industry standards. DISA benefitted from receiving Plaintiff's and Class members' PII, as they were then able to perform background checks and

be paid by Plaintiff's and Class members potential employers, employers, or former employers.

70. The protection of PII was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and DISA, on the other hand. Indeed, as set forth *supra*, DISA recognized the importance of data security and the privacy of PII in its Privacy Policy. Had Plaintiff and Class members known that DISA would not adequately protect their PII, they would not have provided their PII to DISA.

71. Plaintiff and Class members performed their obligations under the implied contract when they provided DISA with their PII.

72. DISA breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII in a manner that complies with applicable laws, regulations, and industry standards.

73. DISA's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

74. Plaintiff and all other Class members were damaged by DISA's breach of implied contracts because: (i) they provided their PII to DISA in exchange for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for

which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

**COUNT IV**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. §§ 1681 *et seq*. ("FCRA")**

75. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

76. One of the fundamental purposes of FCRA is to protect consumers' privacy. 15 U.S.C. § 1681(a)(4). Protecting consumers' privacy involves adopting reasonable procedures to keep sensitive information confidential. 15 U.S.C. § 1681(b).

**77.** FCRA defines a "consumer reporting agency" as:

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

**78.** FCRA defines a "consumer report" as:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under [15 U.S.C. §] 1681(b).

15 U.S.C. § 1681a(d)(1).

79. DISA regularly assembles consumer information including, among other things, names, dates of birth, Social Security Numbers, and driver's license numbers. DISA also regularly utilizes interstate commerce to furnish such information on consumers (consumer reports) to third parties.

80. The background reports that DISA creates for Plaintiff's and Class members' potential employers, employers, or former employers are used for employment purposes, as defined in 15 U.S.C. § 1681a(h) and therefore are Credit Reports under FCRA.

81. FCRA requires that consumer reporting agencies "maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under section 1681b of this title." 15 U.S.C. § 1681e. DISA failed to adopt and maintain these and other reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under 15 U.S.C. § 1681b.

82. DISA's disclosure of Plaintiff's and Class members' PII to cybercriminals is not a purpose for which a consumer report can be furnished under 15 U.S.C. § 1681b.

83. DISA's violations of FCRA, as set forth above, were willful or, at the very least, reckless, constituting willfulness. The many recent data breaches occurring to other companies put DISA on notice that it needs to maintain adequate data security and that its data security was inadequate, yet it still disclosed Plaintiff's and Class members' PII to cybercriminals through inadequate data security.

84. Alternatively, DISA's violations of FCRA were negligent. DISA negligently failed to adopt and maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under 15 U.S.C. § 1681b.

85. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of DISA's violations of FCRA. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in DISA's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

86. Plaintiff and Class Members, therefore, are entitled to compensation for their actual damages or statutory damages of not less than $100, and not more than $1,000, each, as well as attorneys' fees, punitive damages, litigation expenses, and costs, pursuant to 15 U.S.C. § 1681n(a).

87. Alternatively, Plaintiff and Class members are entitled to compensation for their actual damages, as well as attorneys' fees, litigation expenses, and costs, pursuant to 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in HIS favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 4, 2025

Respectfully submitted,

*/s/ Bruce W. Steckler*
Bruce W. Steckler
State Bar No. 00785039
**STECKLER WAYNE & LOVE, PLLC**
12720 Hillcrest Road
Dallas, Texas 75230
Tel: 972-387-4040
Fax: 972-387-4041
bruce@swclaw.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
Cook County Attorney No. 38957
205 West Randolph Street, Suite 1630

Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

David Pastor*
**PASTOR LAW OFFICE**
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Tel: 617-742-9700
Fax: 617-742-9701
dpastor@pastorlawoffice.com

*Attorneys for Plaintiff Daniel Durgin Sr.*

**Pro hac vice* forthcoming